UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

BRIDGET GLADWIN,

               Plaintiff,

    - against –

ROCCO POZZI, sued in his individual
capacity, COUNTY OF WESTCHESTER,

               Defendants.
-------------------------------------------------------X

**DEFENDANTS'
STATEMENT PURSUANT
TO LOCAL RULE 56.1**

06-CV-0650 (SCR)(LMS)

    Pursuant to Local Rule 56.1, Defendants ROCCO POZZI and the COUNTY OF WESTCHESTER contend that there is no genuine issue to be tried with respect to the following facts:

1. Plaintiff Bridget Gladwin was hired as the Deputy Commissioner of Correction for the Westchester County Department of Correction in June 2001. (Gladwin dep. 20).

2. Rocco Pozzi has served as the Commissioner of the Westchester County Department of Correction since 1998. (Pozzi dep. 107).

3. Rocco Pozzi has served as the Commissioner of the Westchester County Department of Probation since 1989. (Pozzi dep. 107).

4. Plaintiff was hired as Deputy Commissioner following a nationwide search for candidates. (Czarnecki dep. 18-19).

5. Commissioner Pozzi is the appointing authority for the Department of Correction and, as such, has final decisionmaking authority regarding the hiring and firing of personnel. (Pozzi dep. 4).

6. Plaintiff was hired to replace R.L Davis, an African-American male, who served as Deputy Commissioner prior to his retirement in October 2000. (Pozzi Aff. ¶¶ 6-10).

7. 49 candidates applied for the Deputy Commissioner position in 2001. (Pozzi Aff. ¶8).

8. Of those 49 candidates, 41 were male and 8 were female. (Pozzi Aff. ¶9).

9. After negotiating her salary with the Commissioner, Plaintiff accepted the Deputy Commissioner position in June 2001. (Gladwin dep. p. 20).

10. At the time of her hiring, Plaintiff was the only Deputy Commissioner within the Department of Correction. (Gladwin dep. p. 21).

11. In June 2001, Plaintiff's responsibilities included overseeing the Women's Division of the Jail, overseeing the Food and Medical contract monitors, overseeing the Administrative area, Program Services, and Pastoral Care. (Gladwin dep. 27-28).

12. In April 2002, Clyde Isley, an African-American male, was hired by Commissioner Pozzi in the title of Second Deputy Commissioner of Correction. (Isley dep. 13).

13. Following Mr. Isley's hiring, Plaintiff's internal departmental title was changed to First Deputy Commissioner of Correction. (Gladwin dep. 55).

14. As First Deputy Commissioner, Plaintiff was superior to the Second Deputy Commissioners and in charge of the Department in the Commissioner's absence. (Gladwin dep. 100).

15. As First Deputy Commissioner, Plaintiff would attend the County Executive's Commissioners Meetings on behalf of Commissioner Pozzi when he was unable to attend. (Gladwin dep. 83, 100).

16. In or about May 2002, Joseph Miranda, the Department's Chief of Operations, had his title changed to Second Deputy Commissioner of Correction. (Miranda dep. 7-8).

17. Joseph Miranda had spent his entire career in the Department of Correction, rising up through the ranks from Correction Officer to Deputy Commissioner. (Gladwin dep. 33).

18. Commissioner Pozzi asked Plaintiff to take the lead on getting Mr. Miranda's title changed to Deputy Commissioner. (Gladwin dep. 41).

19. Plaintiff had no prior experience working in County government prior to her hiring in June 2001. (Gladwin dep. 11).

20. At the time of her hiring, Plaintiff was retired and collecting her pension following a career with the New York State Correction System. (Gladwin dep. 9, 11).

21. Plaintiff had a cordial, professional relationship with Commissioner Pozzi throughout 2001. (Gladwin dep. 34).

22. From the beginning of her tenure with the County, there were members of the Department who would speak to the Commissioner directly about issues rather than speaking to her. (Gladwin dep. 36).

23. Sue Stutman, the Health Services Contract monitor, was one of the employees who would go around Plaintiff to speak directly to the Commissioner about things. (Gladwin dep. 36).

24. When Clyde Isley was hired as Second Deputy Commissioner in April 2002, Commissioner Pozzi asked Plaintiff to assign duties and responsibilities to him. (Gladwin dep. p. 43).

25. Plaintiff assigned Mr. Isley some of her responsibilities, including fiscal administration and inmate programs, and also assigned him some of Chief Miranda's areas of responsibility. (Gladwin dep. p. 44).

26. Plaintiff believed that Mr. Isley had the qualifications to be a Second Deputy Commissioner in terms of his academic background and his experience. (Gladwin dep. p. 46).

27. Plaintiff did not believe that Mr. Isley did some of the things she thought he should do while serving as Second Deputy Commissioner. (Gladwin dep. p. 46).

28. Plaintiff was critical of Mr. Isley's performance as Second Deputy Commissioner. (Gladwin dep. p. 46).

29. In 2003, Plaintiff believed that Deputy Commissioner Isley should have had his responsibilities removed and be let go by the Department. (Gladwin dep. p. 47).

30. Plaintiff spoke with the Commissioner about her belief that Mr. Isley should be terminated in 2003. (Gladwin dep. p. 47).

31. Plaintiff spoke to Joe Miranda and others about her concerns regarding Deputy Commissioner Isley in 2003. (Gladwin dep. p. 47).

32. The concerns Plaintiff had regarding Deputy Commissioner Isley in 2003 involved his failure to take direction from her as well as problems between him and Deputy Commissioner Miranda. (Gladwin dep. p. 48).

33. Commissioner Pozzi supported Plaintiff in her efforts in dealing with Deputy Commissioner Isley in 2003. (Gladwin dep. p. 48).

34. Plaintiff may have told others in the Department that she thought Deputy Commissioner Isley was "lazy" or something equivalent to that. (Gladwin dep. 49).

35. Plaintiff did not believe that Mr. Isley extended himself in his efforts as Deputy Commissioner. (Gladwin dep. p. 49).

36. When Plaintiff spoke to Deputy Commissioner Isley about her concerns he told her that he had his own style and she liked to micro-manage people. (Gladwin dep. pp. 49-50).

37. Plaintiff agreed that she micro-manages people to "a certain extent." (Gladwin dep p. 50).

38. Others in the Department of Correction expressed their belief that Plaintiff micro-managed things. (Gladwin dep. p. 50).

39. Plaintiff did not believe that Deputy Commissioner Isley should have been terminated by the Department in 2005. (Gladwin dep. p. 47).

40. When Joe Miranda was named Second Deputy Commissioner, Plaintiff worked on developing his job responsibilities. (Gladwin dep. p. 51).

41. Deputy Commissioner Miranda's responsibilities were similar to those he had as Chief of Operations. (Gladwin dep. p. 52).

42. Chief of Operations involved being in charge of security and the operation of the facility. (Gladwin dep. p. 52).

43. Anything that had to do with security fell under Deputy Commissioner Miranda's responsibilities. (Gladwin dep. p. 52).

44. Sue Stutman resigned her position as Health Services Monitor because she did not want to deal with Plaintiff. (Gladwin dep. p. 49).

45. Commissioner Pozzi authorized Plaintiff to find a replacement for Ms. Stutman and approved her recommended candidate, June Yozzo, for hiring. (Gladwin dep. 70-71).

46. Commissioner Pozzi approved Plaintiff's recommendation that Rod Quinn, her former colleague from the State system, be hired to oversee the Programs area. (Gladwin dep. 75).

47. Plaintiff had a cordial, professional relationship with Commissioner Pozzi throughout 2002. (Gladwin dep. 72).

48. Plaintiff had a good relationship with Commissioner Pozzi throughout 2003. (Gladwin dep. 76).

49. Throughout her tenure with the Department, Plaintiff had several disagreements with members of the staff regarding her management style. (Gladwin dep. 36, 48-50; Isley dep. 97-99, 101).

50. Commissioner Pozzi had to intervene on several occasions to resolve disputes created by Plaintiff's management style. (Gladwin dep. 48-49; Isley dep. 97-99).

51. Commissioner Pozzi was often supportive of Plaintiff as he attempted to resolve the disputes. (Gladwin dep. 48-49).

52. In January 2004, Plaintiff issued a Memorandum to Commissioner Pozzi entitled "My Position As First Deputy Commissioner." (Gladwin dep. 176).

53. Plaintiff wrote in that Memorandum that Commissioner Pozzi was "a very decent person who I know never wants to intentionally hurt anyone." (Gladwin dep. 184).

54. Plaintiff questioned Commissioner Pozzi's leadership and decisionmaking in her January 2004 Memorandum. (Gladwin dep. 236).

55. Plaintiff advised Commissioner Pozzi that she would "seriously entertain [his] request for [her] resignation" in her Memorandum. (Gladwin dep. 272-73).

56. Plaintiff also stated that she was certain that she could not continue working in the Department if things remained "status quo." (Gladwin dep. 272-73).

57. Plaintiff did not raise any concerns about alleged discrimination in her January 2004 Memorandum. (Gladwin dep. 276-77).

58. Commissioner Pozzi never requested Plaintiff's resignation after receiving her January 2004 Memorandum. (Gladwin dep. 272-75, 444-45).

59. Plaintiff never offered to resign following the issuance of her January 2004 Memorandum. (Gladwin dep. 273-74).

60. Commissioner Pozzi met with Plaintiff the day after she issued her Memorandum. (Gladwin dep. 277-78).

61. Commissioner Pozzi also provided Plaintiff with a written response to her Memorandum. (Gladwin dep. 277).

62. Plaintiff never had any further discussions about any of the issues raised in her Memorandum. (Gladwin dep. 293-93).

63. In 2004 and 2005, Plaintiff had disputes with Donnie Simmons and Maria Morgan from Southern Westchester BOCES. (Gladwin dep. 316; Pozzi dep. 88-89).

64. During 2004 and 2005 Plaintiff had a number of disputes with members of the Department's Pastoral Care group. (Gladwin dep. 322-24; Albert dep. 12-13, 42-43; Tolve dep. 42-43).

65. In 2005, the $12 million contract for inmate medical services provided by Westchester County Medical Center was up for renewal. (Schwartz dep. 15-16).

66. In 2005, the Acting President of the Medical Center, Mary Brown, advised Deputy County Executive Larry Schwartz that the Medical Center was not interested in renewing its contract with the Department if Plaintiff was going to continue to be involved in overseeing the contract. (Schwartz dep. 15-16; Pozzi dep. 109-10).

67. As a result of the concerns from Mary Brown, a decision was made to remove Plaintiff from any oversight responsibilities over the health services contract. (Pozzi dep. 110).

68. After the health services responsibilities were removed from Plaintiff, the Medical Center elected to renew its contract with the Department. (Schwartz dep. 16-17).

69. In December 2005, Fr. Paul Tolve met with Commissioner Pozzi and advised him that the morale in the Department was continuing to decline due to Plaintiff's management style. (Tolve dep. 38-39).

70. Fr. Tolve advised Commissioner Pozzi that he feared staff members were going to start to leave the Department if Plaintiff "did not leave" the Department. (Tolve dep. 38-39).

71. Fr. Tolve had a similar discussion with Deputy County Executive Larry Schwartz in December 2005. (Tolve dep. 41).

72. Commissioner Pozzi made the decision to terminate Plaintiff's employment in late December 2005. (Pozzi dep. 6-7, 93-94).

73. Commissioner Pozzi met with Plaintiff and advised her of his decision to terminate her on January 3, 2006. (Gladwin dep. 353-55).

74. Commissioner Pozzi advised her that he decided to terminate her employment because of the problems created by their different management styles. (Gladwin dep. 353-55).

75. Plaintiff agreed that she and the Commissioner had different management styles. (Gladwin dep. 355).

76. Commissioner Pozzi never made any comments to Plaintiff regarding her race. (Gladwin dep. 141).

77. Commissioner Pozzi never made any comments to Plaintiff regarding her gender. (Gladwin dep. 143).

78. In 2005, Plaintiff made a racist comment to Joseph Spano when she referred to a New York State Trooper as a "redneck cracker." (Gladwin dep. 367-68; Spano dep. 41).

79. In 2005, Commissioner Pozzi supported Plaintiff in a dispute she had with Deputy Commissioner Miranda regarding a staff member. (Gladwin dep. 63).

80. Commissioner Pozzi approved Plaintiff's recommendation that the fiscal operations of the Department be moved from under the auspices of the Security Division. (Gladwin dep. 122).

81. Commissioner Pozzi approved Plaintiff's recommendation that the County close the Women's Jail. (Pozzi dep. 37-38).

82. Plaintiff represented Commissioner Pozzi at numerous meetings when he was unable to attend. (Gladwin dep. 83, 111-12).

83. Plaintiff accompanied Commissioner Pozzi to meet with Deputy County Executive Larry Schwartz on occasion. (Gladwin dep. 84).

84. On one occasion, Plaintiff was the only Deputy Commissioner to attend a special meeting with Commissioner Pozzi and the County Executive regarding an inmate escape. (Gladwin dep. 81-82).

85. Commissioner Pozzi never turned down any request Plaintiff made regarding her attending meetings. (Gladwin dep. 87, 120).

86. Commissioner Pozzi authorized Plaintiff to attend any meeting she asked to attend. (Gladwin dep. 87, 120).

87. After one meeting with Deputy County Executive Schwartz, Plaintiff advised Commissioner Pozzi that she "did not like" to attend meetings at the County offices in White Plains. (Gladwin dep. 86).

88. Plaintiff does not know what meetings were attended by other Deputy Commissioners and she never asked the Commissioner about any such meetings. (Gladwin dep. 88-89).

89. Joseph Spano was the President of the Correction Officers union from approximately 1995 through 2004. (Spano dep. 7-8).

90. Mr. Spano's knowledge of labor relations issues was viewed as a valuable asset for the Department by Commissioner Pozzi and Deputy County Executive Schwartz. (Pozzi dep. 14-15; Schwartz dep. 7).

91. After Mr. Spano lost his bid for re-election to his position as President of the union in December 2004, Commissioner Pozzi offered him the position of Special Assistant to the Commissioner in January 2005. (Pozzi dep. 14-15).

92. Mr. Spano served in the title of Special Assistant throughout 2005. (Pozzi dep. 15).

93. Mr. Spano had unique knowledge of the collective bargaining agreement and other labor relations issues at the time he was appointed to the position of Special Assistant to the Commissioner. (Spano dep. 8, 26-27; Gladwin dep. 463-64).

94. Mr. Spano had served as a Correction Officer prior to his election as President of the Union. (Spano dep. 6).

95. Following Plaintiff's termination, Commissioner Pozzi decided to promote Mr. Spano to the title of Deputy Commissioner. (Pozzi dep. 15).

96. Mr. Spano was promoted into the Civil Service title that was vacated upon Plaintiff's termination. (Spano dep. 46-47).

97. Mr. Spano's position was an exempt Civil Service position which required no minimum qualifications. (Zeman dep. 12-14).

98. Following Plaintiff's termination, Commissioner Pozzi eliminated the internal title of First Deputy Commissioner of Corrections and, instead, simply had three Deputy Commissioners all reporting to him directly. (Pozzi dep. 13; Pozzi Aff. ¶13).

99. Deputy Commissioner Isley, an African-American, does not believe that Plaintiff was terminated because of her race or gender. (Isley dep. 102, 107-08).

100. Deputy Commissioner Miranda retired from the Department in January 2007. (Pozzi Aff. ¶11).

101. Commissioner Pozzi promoted Josephine Gibson to the Civil Service title of Second Deputy Commissioner to replace Deputy Commissioner Miranda in January 2007. (Pozzi Aff. ¶12).

102. Commissioner Pozzi does not possess the authority to establish personnel policies for the County of Westchester. (*Laws of Westchester County*, §110.11(1)).

103. The County Executive possesses the authority to establish personnel policies for the County of Westchester. (*Laws of Westchester County*, §110.11(1)).

104. The County Executive, through Executive Order, has established personnel policies governing, *inter alia*, the hiring and firing of employees for all County departments. (*Exec. Orders 5-2005, 8-2005).*

Respectfully submitted,

Cullen and Dykman LLP

*Of Counsel to County Attorney*
*Charlene M. Indelicato*

By: /s/ James P. Clark  (JC 0824)
Attorneys for Defendants
100 Quentin Roosevelt Blvd.
Garden City, New York  11530
(516) 357-3864