UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
BRIDGET GLADWIN,                     :
                                     :
                    Plaintiff,       :
                                     :
         -against-                   :          **Opinion & Order**
                                     :          06 Civ. 0650 (SCR)(JFK)
ROCCO POZZI &                        :
COUNTY OF WESTCHESTER,               :
                                     :
                    Defendants.      :
----------------------------------X

APPEARANCES

     FOR PLAINTIFF, BRIDGET GLADWIN:

          Christopher D. Watkins, Esq.
          Sussman & Watkins
          40 Park Place
          P.O. Box 1005
          Goshen, New York 10924

     FOR DEFENDANTS, ROCCO POZZI & COUNTY OF WESTCHESTER:

          James P. Clark, Esq.
          Cullen & Dykman, LLP
          100 Quentin Roosevelt Blvd.
          Garden City, New York 11530

**JOHN F. KEENAN, United States District Judge:**

     Plaintiff, Bridget Gladwin, brings this action against her

former employer, the County of Westchester (the "County") and

her former supervisor, Rocco Pozzi, the Westchester County

Commissioner of Corrections ("Pozzi," and, together with the

County, the "Defendants"), asserting claims of race

discrimination under 42 U.S.C. §§ 1981 and 1983 and gender

discrimination under § 1983 because her employment was

1

terminated.  Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  For the following reasons, Defendants' motion is granted in its entirety.

## I.  Factual Background

All facts are undisputed unless otherwise indicated. Bridget Gladwin ("Gladwin" or "Plaintiff") is an African-American woman and was 63 years old at the time of her firing. Prior to her service for the County, Gladwin worked for the New York State Department of Corrections ("NYSDOC") for twenty-five years, seventeen of those years as a Superintendent.  After retiring from NYSDOC, and before her employment with the County, Plaintiff worked as a consultant.

Rocco Pozzi has served as the Commissioner of the Westchester County Department of Corrections ("WCDOC") since 1998.  In this capacity, he acts as the appointing authority for the WCDOC and, as such, has final decision-making authority regarding the hiring and firing of personnel.

Pozzi hired Gladwin as the sole Deputy Commissioner of Corrections for the WCDOC in June 2001.  She replaced an African-American male.  At the time of her hiring, Gladwin was

---

[1] This motion is before me with the consent of the Honorable Stephen Robinson, before whom the motion was originally filed. See Rule 13 of the Local Rules for the Division of Business among District Judges.

the only minority and the only woman on Pozzi's executive team. As Deputy Commissioner, Plaintiff's responsibilities included oversight of the Women's Division of the Jail, the Food and Medical contracts, the Administrative area, Program Services, and Pastoral Care. In addition, Plaintiff was given the responsibility of chairing the Department's Promotion Board.

### A. Gladwin's Employment with the WCDOC

In 2002, Pozzi promoted Plaintiff to the position of First Deputy Commissioner and appointed two Second Deputy Commissioners: Clyde Isley ("Isley"), an African-American male, and Joseph Miranda ("Miranda"), a white male who was formerly the WCDOC's Chief of Operations. Though her title as First Deputy Commissioner made her more senior than the Second Deputies and in charge of the department in Pozzi's absence, Gladwin claims her authority constantly came under attack during her first two-and-a-half years at the WCDOC.

Plaintiff raised concerns regarding Isley's performance – including his failure to take direction from her and problems between him and Miranda — to Pozzi, and even called for Isley's removal in 2003. (Gladwin Dep. at 47-48). When Plaintiff confronted Isley about her concerns, he told her that they had different styles and that she liked to micro-manage people. (Id. at 49-50). Gladwin admits that Pozzi supported Plaintiff in her dealings with Isley in 2003. (Id. at 48).

Plaintiff alleges that Miranda consistently ignored and disrespected her authority, preferring to speak directly with Pozzi. Plaintiff claims that on one occasion in 2003, after asking Miranda about an inquiry by the Vice President of the Westchester Medical Center ("WMC"), Miranda yelled "I'm in charge of security and I'm not discussing it and I don't have to answer to you" in the main lobby of the WCDOC headquarters. (Id. at 64-67). Gladwin also claims that Miranda became abusive towards her staff, including an incident in which he allegedly screamed at June Yozzo — the contract monitor for medical services who reported directly to Plaintiff — until she began to cry and needed to be sent home, (Id. at 59-63), though Yozzo had no specific recollection of the alleged incident. (Yozzo Dep. at 18-19). According to Isley, Miranda also treated him and his staff disrespectfully, erupting into frequent outbursts and using unprofessional language and profanity. (Isley Dep. at 23-27). Though Gladwin brought Miranda's behavior to Pozzi's attention, Pozzi never warned or disciplined Miranda in connection with his conduct. (Miranda Dep. at 30). Rather, Pozzi characterized Miranda as "excitable" and "passionate about issues." (Pozzi Dep. at 24).

Plaintiff grew concerned that Pozzi devalued her and treated her less favorably than Caucasian subordinates. On January 26, 2004, Plaintiff issued a Memorandum to Commissioner

Pozzi entitled "My Position As First Deputy Commissioner." In this document, Gladwin stated that Pozzi was "a very decent person who I know never wants to intentionally hurt anyone." (Pl. Ex. 2 at 1). Nevertheless, the document questioned Pozzi's leadership and decision-making. It stated:

> From the very beginning it has been a challenge not only with respect to the work or responsibilities, but with respect to penetrating "the good old boys club which exists" in the Department. Whether you like to acknowledge this or not there is a good old boys club that exists here even today. As the only female administrator I feel it on an almost daily basis.

(Id.). Gladwin complained in the memorandum that "from the very beginning although I had a title I had little responsibility or authority. I truly felt like 'window dressing.'" (Id.). Among the specific concerns Gladwin raised, Plaintiff described a January 22, 2004 incident during which Pozzi expressly told Plaintiff and Isley that he wanted Isley to appear to take over supervision of the Administrative Support area so "they" would not know that Plaintiff was calling the shots. (Id. at 3). In this memorandum, Plaintiff alluded to resigning over these concerns, but Pozzi never requested her resignation, nor did Plaintiff offer it. (Pl. Ex. 2 at 5).

Pozzi met with Gladwin shortly after she issued her memorandum and also provided her with a written response dated February 6, 2004. (Pl. Ex. 3). This response detailed examples

of Pozzi's support for Plaintiff, such as supporting Plaintiff's plan to move the cashier's function to WCDOC Headquarters under the supervision of the Director of Administrative Services and granting Plaintiff the authority to deal directly with the medical services contract monitor. (Id.).

On February 9, 2004, Pozzi issued Plaintiff a second memorandum addressing alleged verbal outbursts that Plaintiff engaged in at the WCDOC headquarters. Gladwin maintains that she never engaged in such outbursts. (Gladwin Dep. at 310-11). The subject of Pozzi's second memorandum concerned a February 3, 2004 incident during which Plaintiff was scheduled to attend a meeting regarding a complaint against Plaintiff by a WCDOC employee named Jose Sierra. (Gladwin Aff. at ¶ 11). According to Plaintiff, Sierra had been verbally abusive to her and others within the WCDOC. When she attempted to transfer him in connection with this conduct, Sierra — who allegedly had a mental impairment — claimed Plaintiff was engaging in disability discrimination. (Gladwin Dep. at 178-81). Pozzi cancelled the meeting and ultimately rejected Plaintiff's request to transfer Sierra. This allegedly sparked an angry tirade from Plaintiff. In his memorandum addressing the matter, Pozzi noted that Plaintiff's outbursts occurred whenever she became upset with a decision Pozzi had made, and he counseled her to air her complaints to him privately rather than in the hallways and

common work areas. (Pl. Ex. 4). Plaintiff claims, however, that Sierra was subsequently transferred from the department after a white corrections officer complained that Sierra had been verbally abusive to him. (Pl. Ex. 9).

In the spring of 2005, Plaintiff and Isley met separately with Pozzi to address their concerns that Pozzi had two executive teams, one white and one black, and that Pozzi treated the former more favorably. Prior to this meeting, Isley had told Plaintiff that he believed Pozzi's administration was racist, (Isley Dep. at 106:12-21), but after speaking with Pozzi about his concerns, Isley believed that his situation improved. (Id. at 65:8-10).

## B. Complaints Against Plaintiff

A number of employees submitted written complaints regarding Plaintiff's conduct in 2005. Plaintiff disputes the veracity of these complaints and contends that Pozzi solicited them to support her termination. Pozzi maintains that he merely informed employees who made verbal complaints that they could make a record by submitting their complaints in writing. (Id. at 65:15-66:12).

In 2005, Miranda submitted to Pozzi at least two memoranda complaining of Plaintiff's conduct. In the first, dated June 9, 2005, Miranda claimed that, in reference to a white female under consideration for promotion, Plaintiff told him that "[she]

cannot be promoted because we need more minorities." (Pl. Ex. 6). Miranda also claimed he had "cautioned Deputy Gladwin before about remarks she has made at both hiring and promotion boards and she has chosen to disregard my advice." (Id.). In a second memorandum, dated December 22, 2005 and also provided in an email to Pozzi, Miranda stated that Isley told him that he was "cutting [Plaintiff] loose" and was "tired of trying to reason with her." (Id.). Miranda further claimed Plaintiff told Isley, "[C]ome the first of the year I am going to continue to be a big pain in the ass." (Id.).

In a November 29, 2005 memorandum, Stephen Serpagli — the WCDOC's contract monitor for food services and a white male — claimed that "approximately two weeks ago" he "overheard" Plaintiff stating "she never worked under these conditions where things are run so incompetent." (Pl. Ex. 10). Serpagli wrote a second memorandum to Pozzi on December 30, 2005, complaining that Plaintiff confronted him regarding a vendor relationship and told him that he and Plaintiff were going to "have a showdown." (Pl. Ex. 13).

On June 24, 2005, Joseph Spano ("Spano") — a white male who served as a Special Assistant to the Commissioner — made an Equal Employment Opportunity complaint against Plaintiff because she referred to a police officer who gave her a speeding ticket as a "redneck cracker" in his presence. (Pl. Ex. 7). Plaintiff

does not deny calling the officer a "cracker," but argues that the term refers to a "prejudiced white person." (Gladwin Aff. at ¶ 23).

## C.   Alleged Departmental and Staff Disputes Involving Plaintiff

Defendants allege that Plaintiff had a number of other disputes with the WCDOC staff and related entities, including Donnie Simon and Maria Morgan, the administrators from the Southern Westchester Boards of Cooperative Educational Services ("BOCES") program.   Plaintiff conceded as much, but contends that, far from being a problem unique to her, the dispute with BOCES was shared by Rodney Quinn, the Director of Programs.

In 2002, Plaintiff was involved in a dispute with another employee, Sue Strutman, who was then the Medical Services monitor, involving Plaintiff's attempts to decrease Strutman's overtime.   According to Plaintiff, Strutman ultimately left her position because "she didn't want to deal with [Plaintiff]." (Gladwin Dep. at 49:7-8).   After Strutman's resignation, Pozzi accepted Plaintiff's recommended replacement, June Yozzo.

Defendants also cite alleged disputes between Plaintiff and members of the Pastoral Care staff.   These incidents included a dispute over the chaplains' use of County time to obtain their required ecclesiastical trainings, and Plaintiff's decision to restrict their usage of telephones during pastoral and counseling sessions with inmates.   (Gladwin Dep. at 322-24;

Albert Dep. at 12-13, 42-43, Exs. A-B; Tolve Dep. at 42-43).
Both the Reverend Charles Albert, the Director of Pastoral Care,
and the Reverend Paul Tolve ("Tolve"), the Assistant Director,
felt that Plaintiff was improperly inserting herself in their
area of expertise and training. (Albert Dep. at 12-13, 42-43,
Exs. A-B; Tolve Dep. at 42-43). In December 2005, Tolve met
with Pozzi and advised him that Plaintiff's "meddling"
management style was having an adverse effect on the
department's morale. (Tolve Dep. at 38-39). Tolve told Pozzi
that, in his opinion, "the morale [in the WCDOC] was getting so
low that if [Plaintiff] did not leave the facility, [the WCDOC]
were going to lose a lot of staff." (Id.). Plaintiff alleges
that Tolve first voiced concerns regarding her conduct after she
found discrepancies between his reported time and actual
attendance. (Gladwin Dep. at 326:16-331:21).

In 2005, the WMC contract for inmate medical services,
worth between $10.3 and $12 million, was up for renewal. The
acting president of the WMC, Mary Brown ("Brown"), advised
Deputy County Executive Larry Schwartz that the WMC was not
interested in renewing its contract with the WCDOC if Plaintiff
was going to continue to be involved in overseeing the contract.
(Schwartz Dep. at 15-16; Brown Aff. at ¶ 5). Defendants claim
that Plaintiff was removed from this responsibility, (Schwartz

Dep. at 16-17), and thereafter the WMC elected to renew its contract with the WCDOC. (Id. at 15-16).

According to Plaintiff, Brown's complaints stemmed from Plaintiff having raised concerns about the WMC's failure to provide quality medical services to inmates in violation of their contract. (Gladwin Aff. at ¶¶ 24-26). Plaintiff further contends that, prior to any complaint by Brown, Plaintiff made clear that she would not continue to oversee medical services for the WCDOC if a new provider was not brought on board. (Czarnecki Dep. at 40). The County ultimately renewed its contract with the WMC, and Special Assistant to the Commissioner Anthony J. Czarnecki assumed oversight. Plaintiff, however, asserts that, unlike with her, Defendants acceded to Czarnecki's demands regarding the WMC's implementation of services.

On January 3, 2006, Pozzi terminated Plaintiff's employment, citing problems created by her management style and her inability to relate to staff at the WCDOC. Specifically, Pozzi clarified at his deposition that

> there was no one thing. It was a series of things.
> It was complaints that I had been getting on a daily
> basis from staff that either worked directly with
> Bridget or staff – contractors, vendors, who did
> business with the Department of Corrections
> complaining about her management style. . . . I felt
> as though every day I came into work I was putting out
> fires, and it got so overbearing that . . . I decided
> to terminate her.

11

(Pozzi Dep. at 7:6-15). Pozzi further clarified the issue with Gladwin's management style, stating "she was a micromanager" (Id. at 8:22-23) who was not always willing to "work as a team member" (Id. at 6:23-24), leading to staff complaints that they were "unable to work with her." (Id. at 16:17-18). When asked whether she agreed with Pozzi's statement that there was a "difference in styles" between how he and Plaintiff managed, Plaintiff answered "Yes." (Gladwin Dep. at 355).

Shortly after terminating Gladwin's employment, Pozzi appointed Spano to the position of Deputy Commissioner. In her Memorandum of Law in Opposition To Defendants' Motion For Summary Judgment, Plaintiff adds a new claim which is not in her First Amended Complaint, alleging that she was replaced, in part, due to the relationship between Joseph Spano and his cousin, Nicholas Spano, at the time a New York state senator. This relationship need not be addressed because it is not part of her First Amended Complaint and thus is not part of this case.

<h3 align="center">D. The Instant Action</h3>

On January 27, 2006, Gladwin commenced the instant action. In her First Amended Complaint, filed March 23, 2007, Plaintiff asserts claims against Pozzi and the County for race discrimination under §§ 1981 and 1983 and gender discrimination under § 1983, seeking compensatory and punitive damages, pre-

and post-judgment interest, front pay from the date of judgment until Plaintiff reaches seventy years of age, and reasonable attorneys fees' and costs arising from prosecution of this matter.

## II. **Applicable Legal Standards**

### A. Summary Judgment

Summary judgment is warranted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). Thus, when determining whether such issues do exist, the court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Summary judgment is appropriate when the non-moving party has no evidentiary support for an essential element for which it bears the burden of proof. Celotex, 477 U.S. at 322–23. "The mere

existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original).

The United States Supreme Court has stated that "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)). However, the Court exercises caution when determining whether to grant summary judgment to an employer in a discrimination case where, as here, the employer's intent is at issue. Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). Since direct evidence of discriminatory intent will only rarely be available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B. Claims Under §§ 1981 and 1983

Plaintiff asserts claims of gender discrimination under § 1983 and race discrimination under §§ 1981 and 1983 against Pozzi and the County. As a threshold matter, Defendants argue

that Plaintiff's race discrimination claims made under § 1981 are preempted by § 1983.

### 1.  Stating a Claim Under § 1981

Section 1981 provides that

> [a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

42 U.S.C. § 1981. Section 1983 provides the exclusive remedy for violations of the rights guaranteed under § 1981 in a claim against a state actor. Id.; accord Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d 689, 707 (S.D.N.Y. 2003). To the extent Gladwin seeks to vindicate any independent rights for race discrimination under § 1981, she must do so via claims made under § 1983 because both Pozzi — in his capacity as the WCDOC Commissioner — and the County are state actors. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 736 (1989).

Plaintiff's brief notes that, while "[t]here is some question as to whether § 1981(c), added to § 1981 as part of the Civil Rights Act of 1991, creates an implicit private right of action against state actors under § 1981, thereby statutorily overruling Jett," courts in this Circuit have not deviated from Jett's holding in the absence of controlling authority to the contrary from the Court of Appeals. (Pl. Br. at 17 n.7 (quoting

Roper v. Hynes, No. 05 Civ. 7664, 2006 WL 2773032, at *12 (S.D.N.Y. Sept. 27, 2006))). See Whaley v. City Univ. of N.Y., 555 F. Supp. 2d 381, 401 (S.D.N.Y. 2008); Edwards v. Town of Huntington, No. 05 Civ. 339, 2007 WL 2027913, at *3 (E.D.N.Y. July 11, 2007); Roper, 2006 WL 2773032, at *12; Bond v. City of Middletown, 389 F. Supp. 2d 319, 327-28 (D. Conn. 2005); Perry v. Metro. Suburban Bus Auth., 319 F. Supp. 2d 338, 341-42 (E.D.N.Y. 2004); Hill v. Taconic Developmental Disabilities Servs. Office, 283 F. Supp. 2d 955, 957-58 (S.D.N.Y. 2003); Sullivan, 281 F. Supp. at 708; Roddini v. City Univ. of N.Y., No. 02 Civ. 4640, 2003 WL 435981, at *5 (S.D.N.Y. Feb. 21, 2003); Mack v. Port Auth. of N.Y. & N.J., 225 F. Supp. 2d 376, 383 (S.D.N.Y. 2002).  Therefore, "[b]ecause § 1981 provides no broader remedy against a state actor than § 1983 and since they merge into one another, the court need provide no further analysis on this point.  The § 1981 claim is treated exactly like the § 1983 claim, becomes merged into it and is considered as a single claim." Booker v. Bd. of Educ., 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002) (quoting Pearson v. Macon-Bibb County Hosp. Auth., 952 F.2d 1274, 1278 n.3 (11th Cir. 1992)).

## 2. § 1983 Claims Against Pozzi

Since Plaintiff's § 1981 and § 1983 claims merge, all of Plaintiff's remaining federal claims are analyzed under § 1983, which states, in relevant part:

16

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> . . . subjects, or causes to be subjected, any citizen
> of the United States . . . to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must show that: (1) the defendant acted under color of state law; and (2) the defendant's conduct or actions deprived plaintiff of rights, privileges, or immunities guaranteed by the Constitution. See Washington v. County of Rockland, 373 F.3d 310, 315 (2d Cir. 2004). That Pozzi acted under color of state law is uncontested; therefore, the issue is whether Defendants deprived Plaintiff of her constitutional rights.

To make out a prima facie case for race or gender discrimination under § 1983, Plaintiff must allege that: (1) she falls within a protected class; (2) she was performing her duties satisfactorily; (3) she was subject to an adverse employment action; and (4) the adverse employment action was taken under circumstances giving rise to an inference of unlawful discrimination. See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

### 3.   § 1983 Claims Against Municipalities

A defendant municipality cannot be held liable in a § 1983 action solely on the basis of respondeat superior. Monell v.

_Dep't of Soc. Servs. of N.Y._, 436 U.S. 658, 694 (1978). A municipality may be held liable under § 1983 only when there is a deprivation of rights pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." _Id._ at 690. For a municipality to be liable for the actions of its employees or agents, they must be executing a government policy or custom, "whether made by its lawmakers or those whose edicts or acts are fairly said to represent official policy." _Id._ at 694. Where, as here,

> the contention is not that the actions complained of
> were taken pursuant to a local policy that was
> formally adopted or ratified but rather that they were
> taken or caused by an official whose actions represent
> official policy, the court must determine whether that
> official had final policymaking authority in the
> particular area involved.

_Jeffes v. Barnes_, 208 F.3d 49, 57 (2d Cir. 2000); _see also_ _City of St. Louis v. Praprotnik_, 485 U.S. 112, 127 (1988) ("[O]nly those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability." (internal quotation omitted)).

### C.   Application of the McDonnell Douglas Analysis to Plaintiff's § 1983 Claims

#### 1.   Plaintiff's § 1983 Claims Against Pozzi

The Court applies the three-step burden-shifting analysis of _McDonnell Douglas Corp. v. Green_, 411 U.S. 792, 802–04 (1973)

in analyzing whether Plaintiff has established a prima facie case for race or gender discrimination under § 1983. See Hicks, 509 U.S. at 506. Under this framework, the employee first bears the burden of establishing a prima facie case of discrimination.

Second, after Plaintiff establishes the existence of a prima facie case, there is a presumption that the employer unlawfully discriminated against the employee, thus shifting the burden to the employer "to articulate some legitimate nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. The defendant bears the burden of producing evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." Hicks, 509 U.S. at 509 (emphasis in original). "This burden is one of production, not persuasion; it 'can have no credibility assessment.'" Reeves, 530 U.S. at 141 (quoting Hicks, 509 U.S. at 509 (1993)).

Third, if the employer carries its burden, the burden shifts back to the employee to demonstrate that the legitimate reasons offered by the employer were a pretext for discrimination. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). A plaintiff cannot prove an employer's stated reason for termination to be a pretext "unless [the plaintiff] shows by a preponderance of the evidence that the proffered reason was false and that discrimination was the

real reason." Shokry v. Trigen Energy Corp., No. 04 Civ. 1279, 2006 WL 44099, at *19 (S.D.N.Y. Jan. 9, 2006). To carry this burden, the plaintiff "may show that a discriminatory reason, rather than the proffered reason, more likely motivated the employer, or that the explanation the employer provided is "unworthy of credence." Id. (quoting Burdine, 450 U.S. at 255). To do so, a "plaintiff may demonstrate pretext by illuminating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' that would raise doubt in the factfinder's mind that the employer did not act for those reasons." Bogdan v. N.Y. City Transit Auth., No. 02 Civ. 09587, 2005 WL 1161812, at *8 (S.D.N.Y. May 17, 2005) (quoting Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005)). While this burden of production may shift, the plaintiff always bears the burden of proving intentional discrimination. Id. at 253; see also Hicks, 509 U.S. at 507.

a. Plaintiff's Prima Facie Case for Race and Gender Discrimination Under § 1983

Defendants contest elements two and four of Plaintiff's prima facie case — i.e., that she was performing her duties satisfactorily at the time of her termination, and that she was discharged under circumstances giving rise to an inference of race discrimination.

20

With regard to her performance — element two of her prima facie case — Plaintiff's evidence includes the fact that she did not receive a single negative performance evaluation over the course of her four and a half years as Deputy Commissioner, and she has produced testimony from witnesses describing her performance on the job as "very effective," "fine," "very efficient," "dedicated," and "competent." Plaintiff has met the burden to establish this prong of her prima facie case.

Furthermore, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." Zimmerman v. Assocs First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). Because Plaintiff has raised a triable issue of fact as to whether Spano, a white male, replaced her, she has satisfied the fourth prong of her prima facie case.

### b. Defendants' Non-Discriminatory Reason for Terminating Plaintiff's Employment

Defendants argue that, far from a pretext for discrimination, Pozzi decided to terminate Gladwin's employment because of problems created by their different management styles and the strains placed on the WCDOC as a result of her management style. The record reflects that in 2004 and 2005, Pozzi learned of numerous complaints regarding Plaintiff's

conduct which implicated Plaintiff's management style in some way, shape, or form. Having so argued, the Defendants articulated a legitimate reason for terminating Gladwin sufficient to meet their burden of production.

### c.    Pretext for Discrimination

In addition to claims of disparate treatment and devaluation made to support her prima facie case, Plaintiff essentially advances three arguments to attack Defendants' proffered reason for terminating her employment. First, Plaintiff claims that Pozzi tolerated different management styles from his white male subordinates, including Miranda. Second, Plaintiff argues that the evidence would allow a jury to discredit the complaints about Plaintiff upon which Defendants rely. Finally, Plaintiff argues that a reasonable jury may conclude that Pozzi predetermined to replace Plaintiff with Spano and only sought to justify that predetermination with pretextual reasons after the fact. Upon a complete examination of the record, the Court concludes that no reasonable fact-finder could find that Defendants' proffered reason for terminating Plaintiff was pretext for discrimination.

As an initial matter, "[i]n a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer; the factual validity of the underlying imputation

against the employee is not at issue." McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (citation omitted). Therefore, the Court need not determine whether the complaints against Plaintiff were credible, accurate, or worthy of action. Plaintiff has only argued that the substance of the complaints is false, not that Pozzi pretextually relied on these complaints when deciding to terminate Plaintiff's employment. No reasonable juror could conclude from this evidence that Pozzi acted with racial or gender bias.

Furthermore, Plaintiff's allegation regarding Pozzi's predetermination to hire Spano, even assuming it is true, is insufficient to defeat summary judgment in and of itself. Plaintiff must also establish that Pozzi terminated Gladwin's employment because of her race or her gender. As with Title VII, the purpose of § 1983 "is not to review employment decisions or to protect employees from all forms of adverse treatment in the workplace, but to ensure 'that the workplace be an environment free of discrimination.'" Velez v. SES Operating Corp., No. 07 Civ. 10946, 2009 WL 3817461, at *12 (S.D.N.Y. Nov. 12, 2009) (quoting Ricci v. DeStefano, 557 U.S. ---, 129 S.Ct. 2658, 2674 (2009)). In the absence of such evidence, Plaintiff cannot establish that Pozzi's reasons for terminating Plaintiff's employment were pretext for discrimination.

Therefore, Plaintiff's only viable argument of the three is that Pozzi's toleration of Miranda's conduct casts doubt over Pozzi's proffered reason for her termination. Specifically, Plaintiff argues that Pozzi tolerated Miranda yelling and throwing things at him without any repercussion, even after receiving complaints about Miranda from Isley and Plaintiff. Furthermore, Plaintiff argues that Miranda's abusive treatment of staff at the WCDOC caused greater friction for the department than did Plaintiff's conduct. Plaintiff claims that Pozzi issued her a fabricated counseling memorandum regarding her alleged verbal outbursts, even though he was not present when the alleged outbursts occurred, and eventually fired her.

Plaintiff's argument on management styles fails to present a convincing case of disparate treatment or to suggest that Pozzi's proffered reason for her termination was pretext. First, Pozzi did not discipline Plaintiff for her alleged verbal outburst regarding the Sierra incident; he sent her a private memorandum essentially requesting that she not undermine his authority in front of WCDOC staff. Based on the record, Pozzi took no further action. As to why Pozzi did not issue such a memorandum to Miranda, nothing in the record supports a finding that Miranda ever publicly disparaged Pozzi as Plaintiff did; therefore, Pozzi did not have to request that Miranda not

disparage him in front of staff as he felt the need to do after Plaintiff's conduct.

Second, Plaintiff's argument on this point fails to address meaningfully the facts supporting the articulated reason for her termination. Pozzi's stated reason for terminating Plaintiff's employment was her management style, not her verbal outbursts. Specifically, Pozzi testified that he disapproved of Plaintiff's micromanaging of subordinates, her "my way or the highway" attitude, and her inability to work well with WCDOC staff and entities doing business with the WCDOC. The problems Plaintiff allegedly caused at the WCDOC went beyond clashes of personality and on at least one occasion, during the contract dispute with the WMC, nearly cost the department financially. Nothing in the record indicates, and Plaintiff has not supplied any evidence, that Miranda's management style caused similar problems for the department or forced Pozzi to continually "put out fires" sparked by Miranda as Pozzi stated he had to in response to situations involving Plaintiff.

Additionally, Plaintiff's assertions that Pozzi was dismissive of her suggestions — except those criticizing Isley — are not supported by the record. Pozzi did deny Plaintiff's request to transfer Sierra, but the record reflects that he denied this request due to concerns raised by the WCDOC Law Department. The record also provides several instances in which

Pozzi acceded to Plaintiff's requests, such as supporting Plaintiff during her disputes with Isley and Strutman, supporting Plaintiff's recommendation to hire Yozzo and Quinn, supporting Plaintiff's plan to move the cashier's function to WCDOC Headquarters under the supervision of the Director of Administrative Services, and supporting Plaintiff in dealing directly with the WCDOC medical contracts monitor. That Pozzi was not receptive to every request or recommendation made by Plaintiff can hardly be called discriminatory. Further, Plaintiff has not alleged that Pozzi was receptive to all requests and recommendations made by his white male subordinates.

Furthermore, Plaintiff's claims of disparate treatment and devaluation also ignore a number of other relevant facts. Pozzi initially hired Plaintiff to replace an African-American male as Deputy Commissioner. He then promoted Plaintiff to First Deputy Commissioner after hiring an African-American male and a white male as Second Deputy Commissioners. As one of two African-Americans and the only woman on Pozzi's executive team, Plaintiff was appointed first among all other deputies.

Plaintiff was fired by the same man — Pozzi — who had hired her nearly five-and-a-half years earlier. The Second Circuit has held that "where the person who made the decision to fire was the same person who made the decision to hire, it is

difficult to impute to [the employer] an invidious motivation that would be inconsistent with the decision to hire." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997). While recognizing that it is not the Court's function "to weigh the evidence and determine the truth of the matter" at the summary judgment stage, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), it is clear upon "examin[ing] the entire record" that no reasonable fact-finder could find in Plaintiff's favor. Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2001) (citation omitted). Here, the combined effect of the same actor inference, Plaintiff's failure to produce any direct or circumstantial evidence of racial or gender discrimination, and the abundant evidence supporting Pozzi's stated reason for terminating Plaintiff's employment leads to the conclusion that no reasonable jury could draw the ultimate inference that Pozzi was motivated by racial or gender animus in firing Plaintiff.

### 2. Plaintiff's § 1983 Claims Against the County

Here, Plaintiff has not raised a genuine issue of material fact that her constitutional rights were violated by Pozzi's decision to terminate her employment, much less that any violation was the result of a custom or policy of the County. Therefore, there is no basis for finding the County liable and no need for further analysis on this issue.

## III. Conclusion

The Defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close the case.

**SO ORDERED.**

**Dated:**     **New York, N.Y.**
              **January 2 / , 2010**

John F. Keenan
**United States District Judge**